1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   SOUTHERN DISTRICT OF CALIFORNIA

10

11  SEAN ANDERSON,                    )  Case No. 06cv0216-J (BLM)
                                      )
12              Plaintiff,            )  **REPORT AND RECOMMENDATION FOR**
    v.                                )  **ORDER GRANTING PLAINTIFF'S**
13                                    )  **MOTION FOR SUMMARY JUDGMENT**
    JO ANNE B. BARNHART,              )  **[DOC. NO. 11] AND DENYING**
14  Commissioner of Social           )  **DEFENDANT'S CROSS-MOTION FOR**
    Security,                        )  **SUMMARY JUDGMENT [DOC. NO. 14]**
15                                    )
                Defendant.            )
16  _____ )

17        Sean Anderson brought this action to obtain judicial review of

18  the Social Security Commissioner's final decision denying his claim

19  for disability insurance benefits and supplemental security income

20  under Titles II and XVI of the Social Security Act.  42 U.S.C. §§

21  401-33 (as amended on March 2, 2004, by Pub. L. No. 108-203).

22  Before the Court are Plaintiff's motion for summary judgment,

23  Defendant's cross-motion for summary judgment and opposition to

24  Plaintiff's motion, and Plaintiff's opposition to Defendant's cross-

25  motion.

26        These motions were referred to Magistrate Judge Major for the

27  issuance of a report and recommendation pursuant to 28 U.S.C. §

28  636(b)(1)(B) and Federal Rule of Civil Procedure 72(b).  This Court

found the motions appropriate for submission on the papers and without oral argument pursuant to Local Rule 7.1(d)(1).  Doc. No. 10.  For the reasons set forth herein, this Court **RECOMMENDS** that Plaintiff's motion be GRANTED and Defendant's cross-motion be DENIED.

## **PROCEDURAL BACKGROUND**

On August 28, 2003[1], Plaintiff filed an application for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act alleging that he had been disabled due to post traumatic stress disorder, anxiety disorder, and food addiction since November 26, 2002. Administrative Record (hereinafter "AR") at 13, 74-76, 118, 299-301. The application was denied initially and upon reconsideration (AR at 23-33), resulting in Plaintiff's request for an administrative hearing.  AR at 34.

On June 22, 2005, a hearing was held before Administrative Law Judge ("ALJ") Edward Steinman. AR at 307-33.  Plaintiff, Dr. Sidney Bolter (a medical expert), and Bonnie Sinclair (a vocational expert ("VE")) testified at the hearing.  AR at 307-33.  By written decision dated August 6, 2005, ALJ Steinman found that Plaintiff could perform his past relevant work and, therefore, was not disabled.  AR at 9-19.  Plaintiff requested administrative review. See AR at 5-8.  On December 2, 2005, the Appeals Council found no basis for disturbing the ALJ's ruling and the decision became final. AR at 5-8.

---

[1]    The ALJ's decision and Plaintiff's moving papers list August 1, 2003 as the date on which Plaintiff filed for disability benefits, but the administrative record shows the filing date to be August 28, 2003.  See AR at 74-76, 118, 299-301.

On January 30, 2006, Plaintiff filed the instant action seeking judicial review by the federal district court. Doc. No. 1. On May 17, 2006, Plaintiff filed the motion for summary judgment at issue in this report and recommendation. Doc. No. 11. Defendant filed a cross-motion for summary judgment and opposition to Plaintiff's motion on July 3, 2006. Doc. Nos. 14, 16. Plaintiff timely opposed Defendant's cross-motion. Doc. No. 18. Neither party filed a reply.

**FACTUAL BACKGROUND**

**A.   Plaintiff's Educational and Employment History**

Born on September 18, 1970, Plaintiff was thirty-four at the time of the ALJ's decision. Pl.'s Mem. at 1; AR at 74-76. Plaintiff has a high school education, has completed about four years of collegiate study, and states that he is a member of MENSA. AR at 13, 115, 314-15. Prior to the onset of his alleged disability, Plaintiff held employment positions including cashier, taxi driver, mail handler, sailor in the United States Navy (on two separate occasions with different duties), truck driver, custodian, mechanic, phone operator, cook, and school bus driver — all for relatively short durations between 1989 and August 2003. AR at 95, 111, 143. Plaintiff reported being fired from many of these positions. See AR at 241, 271, 279, 310-11.

**B.   Plaintiff's Medical History**

The medical records indicate that Plaintiff has actively sought treatment and made use of rehabilitative services from several providers over the years.

///

///

### 1.   <u>Treatment at Phelps Memorial Hospital Center</u>

The earliest medical records included in the administrative record cover the period from May to August of 2001. AR at 152-71. Upon initial presentation at Phelps Memorial Hospital Center, Plaintiff indicated that he had been sober for three years and was active in Alcoholics Anonymous, but was not able to achieve vocational goals. AR at 171. Plaintiff also described additional symptoms of sadness, violent tendencies, and long-term memory loss and inquired as to whether he might have post-traumatic stress disorder ("PTSD") attributable to (1) a history of alcohol and drug abuse on both sides of his family, (2) a bipolar father who molested his step-sisters and disowned Plaintiff, (3) his paternal grandfather, who was a pedophile, (4) the fact that his grandmother was beheaded in a car accident when he was four (Plaintiff was not in the car), (5) the constant emotional, verbal and physical violence to which he was subjected as a child, and (6) the fact that he had been drinking alcohol since the age of 6. AR at 167-68. He was diagnosed with dysthemia, alcohol and cocaine dependence in remission, and borderline personality disorder and assigned a Global Assessment of Functioning ("GAF") score of 55. AR at 170. After examining him, the treating therapist also diagnosed chronic PTSD. AR at 164.

Therapy records indicate a goal of teaching Plaintiff to modulate his thoughts and feelings so that he could maintain close and non-intrusive relationships with others. AR at 156. Follow-up records suggest that Plaintiff attempted to employ the techniques he learned in therapy, with some success. AR at 152-54.

///

4

## 2. Dr. Mounir Soliman's Psychiatric Evaluation

At the Department of Rehabilitation's request, Dr. Soliman evaluated Plaintiff and issued a report dated March 3, 2003. AR at 172-76. Plaintiff presented with nightmares, flashbacks, depression, and occasional hyper-vigilance. AR at 173. According to Dr. Soliman, "[t]he patient indicated that he is motivated to be enrolled with the Department of Rehabilitation so he can learn new skills to get new jobs." Id.

Dr. Soliman found that Plaintiff appeared anxious, but was pleasant and cooperative and had normal abilities for abstract thinking and insight. AR at 174. He noted no looseness of associations and no evidence of auditory or visual hallucinations, though he did find that Plaintiff's neurovegetative signs and symptoms were significant for decreased energy. Id. Upon completing his examination, Dr. Soliman diagnosed Plaintiff as suffering from PTSD and having a history of substance abuse (in remission) and borderline personality disorder. AR at 175. He assigned a GAF score of "about 60." Id. As to whether Plaintiff could adapt to work situations, Dr. Soliman opined as follows:

> From a psychiatric standpoint, the patient is able to understand, carry out, and remember simple and complex instructions. The patient is able to interact with co-workers, supervisors, and the general public. The patient is able to withstand the stress and pressures associated with an eight-hour workday, and day-to-day activities.

Id. However, Dr. Soliman further noted that "[u]nfortunately, [Plaintiff] has never been treated by a psychiatrist and has never been under any psychiatric treatment ...," though "he would benefit from ... group psychotherapy and medication if the patient agrees to take them to help him with the post-traumatic stress disorder

1  symptoms."   Id.

2        **3.   Treatment by County Mental Health[2] and Dr. Mills**

3        During Plaintiff's initial assessment by a Mental Health

4  Services evaluator[3] on June 5, 2003, he reported essentially the same

5  history of family abuse and trauma that was previously discussed,

6  though he added that his mother's treatment of him constituted

7  "covert incest" (such as treating him as a spouse but without sexual

8  contact) and that he had a restraining order against her.   AR at

9  178-86.   He also clarified that he had been abusing alcohol since

10  age four and that he had actually witnessed his father molesting his

11  step-sisters (though he reported that he does not recall it). AR at

12  178, 180.   Plaintiff indicated that he wanted referrals to PTSD

13  groups.   AR at 181, 183.

14        The evaluator noted that Plaintiff's thought processes were

15  grossly intact and that Plaintiff was cooperative, attentive to all

16  questions asked, and of above-average intelligence.   AR at 181.   He

17  or she diagnosed PTSD, alcohol dependence in sustained full

18  remission, and a GAF score of 35.   AR at 181.   The only treatment

19  note offered by this evaluator was that Plaintiff "would benefit

20  from coping skills training."   AR at 183.

21        During the latter half of 2003, Plaintiff attended group

22  sessions geared towards (1) anxiety and phobias, (2) anger

23  management, and (3) depression and anxiety.   AR at 287-88, 290.   In

24  2004, Plaintiff began receiving individual therapy.   AR at 247-80.

25  During one session, the therapist noted that "clt [client] has a hx

26  _____

27        [2]     Many of the records reference Areta Crowell Center.   This center is
affiliated with County Mental Health.   See e.g., AR at 218.

28        [3]     The signature and title are illegible.

[history] of presenting better than he actually is" and, therefore, administered a personality inventory to help differentiate the diagnosis. AR at 275. During another session, the therapist noted:

> Client spoke about his difficulties in maintaining employment. He was discharged from the military after 9 months as being mentally ill, but not disabled. He spoke about 4 jobs that lasted no more than 4 months. In addition, he drove a taxi for a year and a half and really liked it and left in good standing ... Client is aware that he has difficulties dealing with bosses, but is not really sure what is wrong with him.

AR at 271. In November of 2004, a therapist observed that Plaintiff believed he had ESP (extrasensory perception), that he skipped from topic to topic, that he was overly rigid in social interactions, and that he should be evaluated for medications to reduce his anxiety and mood difficulties. AR at 259-60. Plaintiff continued in group therapy through at least 2005, attending the interpersonal effectiveness group, the self esteem and boundaries group, and the anger management group during April and May of 2005. AR at 220-21, 225.

Dr. Donna Mills was Plaintiff's primary treating physician at County Mental Health from about July 21, 2003[4], to at least May 19, 2005. AR at 177, 217, 227, 231, 236, 243, 246, 254, 258. When Dr. Mills evaluated Plaintiff on November 16, 2004, she noted anxiety, an inability to relax (hyper-vigilence), and episodic tearfulness and prescribed Paxil CR.[5] AR at 258. During examinations in January and March of 2005, Dr. Mills again noted that Plaintiff experienced

---

[4]    Notes from July 21, 2003, appear to be signed by Dr. Mills. AR at 177.

[5]    Though the content of this medical record is discernible, as both parties and the reviewing physicians have expressed, many of Dr. Mills' notes are illegible.

"episodic anxiety" (AR at 231, 243) and "difficulty focusing" (AR at 231).  On May 23, 2005, Dr. Mills switched Plaintiff from Paxil CR to Pexeva.   AR at 231.   Subsequently, Dr. Mills observed that Plaintiff's mood was better and he had decreased anxiety.   AR at 227.

On June 8, 2005, Dr. Mills completed a psychiatric review form based on her "weekly contact" with Plaintiff since his June 5, 2003 admission.  AR at 294-97.   Therein she diagnosed him with PTSD and assigned a GAF score of 35, noting that he also had "problems with primary support group, social environment, occupational, housing, economic."  AR at 294.   She reported that "[c]lient has been in individual therapy with minimal progress.  Medications therapy since 3/18/04 with no adverse reactions."  AR at 295.   Having administered the MMPI-2 (a written psychiatric inventory used to diagnose mental disorders), she found Plaintiff in the clinical range in "masculinity/feminity, paranoia, and, schizophrenia."  AR at 296.

In reference to work, Dr. Mills anticipated that Plaintiff's impairments or treatment would cause him to miss work more than three times a month and she opined that he would have difficulty working at a regular job on a sustained basis.  AR at 296.   Dr. Mills explained the basis for this assessment, stating:

> Client has attempted to sustain work with no success.  His symptoms restrict ability to perform, obtain, and maintain employee (sic).   Interpersonal, intrapsychic, and consequential function is impaired.

Id.  She further noted marked limitations in Plaintiff's functional ability to engage in the activities of daily living, to maintain social functioning, and to maintain concentration, persistence, or pace, though she only reported one or two episodes of

8

decompensation.  AR at 297.  Finally, Dr. Mills commented that:

> Client has odd beliefs that are inconsistent with cultural norms, as well as unusual perceptual experiences, including bodily illusions.  He demonstrates suspiciousness and paranoid idea with inappropriate affect.  Deficit in interrelational function.

Id.

### 4.   Dr. Richard Hicks' Psychiatric Evaluation

On October 30, 2003, Dr. Richard Hicks performed a psychiatric evaluation of Plaintiff.  AR at 187-93.  He found that there is "no loosening of associations" or "tangentiality" or "circumstantiality," though Plaintiff "does at times say a lot about certain topics where he is sort of intellectualizing."  AR at 190. Under "thought content," Dr. Hicks reported:

> There are no obsessions except that he is a little bit upset that that (sic) rules do not work for him anyway. There is a slight paranoid flavoring to this but it is not really well organized.  It is not really delusional. There is a little bit of grandiosity mixed in.  There are no ideas of reference.

Id.  Dr. Hicks noted the presence of some outbursts of anger, impulsiveness, and sleep disturbance, but did not find Plaintiff to be particularly anxious, hopeless or depressed.  Id.  Accordingly, Dr. Hicks diagnosed Plaintiff as having alcohol abuse in remission for six years, a mild adjustment disorder, a mild personality disorder, and a GAF score of about 75 or 80.  AR at 192.  He opined that Plaintiff could do simple and repetitive tasks and even more detailed and complex ones, but would have trouble taking simple instructions from supervisors.  Id.  More specifically, he explained that:

> He does irritate people.  He just does not take instructions well.  His interactions with coworkers and the public would be limited by his being a perfectionist.

His consistency and regularity would be ok.
*Id.*   Dr. Hicks concluded that Plaintiff would need ongoing psychotherapy.   *Id.*

### 5.   Consultative Reviews by Non-Examining Physicians

In a functional capacity assessment dated November 17, 2003, Dr. Herbert Hurwitz, a psychiatrist, provided a consultative assessment of Plaintiff based on his review of Plaintiff's medical records from November 2002 to November 2003.  AR at 194-211.  Dr. Hurwitz concluded that Plaintiff's abilities to (1) carry out detailed instructions, (2) maintain attention and concentration for extended periods, (3) make simple work-related decisions, (4) interact appropriately with the general public, and (5) set realistic goals or make plans independently of others were "moderately limited."   AR at 194-95.   Contrary to Dr. Mills' assessment, Dr. Hurwitz opined that only moderate limitations on Plaintiff's ability to maintain social functioning and to maintain concentration, persistence, or pace existed, though he too reported one or two episodes of decompensation.  AR at 208.  Otherwise, Dr. Hurwitz did not find Plaintiff's work-related abilities to be significantly limited.   *Id.*   As a result, he concluded that Plaintiff could perform simple, repetitive work tasks for a normal workday and work week, could relate in an appropriate and socially effective manner with coworkers and supervisors but not the general public, and could adapt appropriately to a variety of work setting situations and changes.  AR at 196.

Dr. Ed O'Malley, another psychiatrist, reviewed Dr. Hurwitz's assessment and affirmed his conclusions on March 22, 2004.  AR at 212.

06cv0216-J (BLM)

C.   **Evaluation Submitted by Plaintiff's Friend, James Nichols**

On September 23, 2003, Plaintiff's friend, James Nichols, completed and signed a form issued by the Social Security Administration entitled "Function Report Adult - Third Party." AR at 121-29. Therein he indicated that he had known Plaintiff for two years and spent from six to eight hours per week with Plaintiff. AR at 121. In section B, entitled "information about daily activities," Mr. Nichols provided information (in narrative and checkbox format) about Plaintiff's daily activities, meal habits, house and yard work chores, ability to get around, management of money, hobbies and interests, and social activities. AR at 121-26.

Section C of the Function Report, requesting "information about abilities," required Mr. Nichols to "[c]ircle any of the following items the disabled person's illness, injuries, or conditions affect." AR at 126. Mr. Nichols circled "completing tasks," "concentration," "following instructions," and "getting along with others." Id. As a follow up question, the Function Report asks "[p]lease explain how his/her illness, injuries or conditions affect each of the items you circled." Id. In response, Mr. Nichols wrote:

> (1) Following instructions - takes them as a personal threat - will do something different (2) Completing tasks - become (sic) easily distracted & forgets about what he was doing (3) Concentration - has a short attention span - usually has his own ideas about things [4] Getting along [] with others - is easily hurt by others - feels that other people have wronged him - don't care or have deceived him - has trouble listening to other people's point of view - thinks everyone else is crazy but himself.

AR at 126, 128. To the question "[h]as he/she ever been fired or laid off from a job because of problems getting along with other people," Mr. Nichols replied "yes" and wrote "[h]e told me about

various jobs he had & it usually evolves (sic) around him telling them how the job should be done." AR at 127. In response to the next question, "[h]ow well does the disabled person handle stress," Mr. Nichols wrote "[t]his is one of his biggest problems - if he feels any type of pressure - he becomes fearful - disorientated (sic) - trouble taking care of himself - unreasonable ideas & demands on others - to the point of not making sense." Id.

### D.   June 22, 2005 Hearing Testimony

At the hearing, the ALJ heard testimony from Plaintiff, Dr. Bolter (the medical expert), and a VE. Plaintiff testified that he had worked in a number of jobs, but was unable to sustain work - frequently because he was fired after a short period of time. AR at 310-16. For instance, he last worked as an assistant warehouseman in December of 2004 but was laid off after a month "due to lack of work and due to political issues on the job." AR at 310. When the ALJ inquired as to why Plaintiff thought he was unable to sustain work, Plaintiff repeatedly launched into extended explanations that tended to veer off topic. AR at 313-16. In three instances, the ALJ responded by interrupting Plaintiff and presenting him with a new question. AR at 315-16.

Plaintiff further testified that he was currently taking Pexceva to help him "kind of settle down [his] reactions to things." AR at 316. While it helped him become cognizant of how angry and frustrated he gets, he said his interpersonal relationships had not really improving as a result of the medication. AR at 317. The ALJ commented that this seemed in accord with Dr. Mill's assessment that Plaintiff's interpersonal skills were impaired. AR at 317. When the ALJ inquired as to whether Plaintiff's PTSD disrupted his

ability to function, Plaintiff responded "Yeah.  I have what I call episodes of the situations where I'll kind of shut down, not know where I am, just really close down."  AR at 318.  Finally, Plaintiff testified that he feels anxious, his mood changes frequently, he has trouble concentrating after he has been interrupted, he thinks about suicide regularly, and he is able to read people's minds.  AR at 321-23.

The ALJ then elicited testimony from Dr. Bolter.  Having reviewed the medical records, Dr. Bolter concluded (referencing diagnostic codes):

> I would add it up to this.  That he has a dystemia of 1204, other.  He's got a 1206 PTSD and he has a very strong 1208, early, it's 1208 which is a personality disorder.  I'd say it's mixed with schizotype features ... [a]nd borderline features.

AR at 327.  Because of these disorders, Dr. Bolter opined that Plaintiff could do complex tasks, but would have to be "in a very restrictive environment" that was "docile" and non-public and in which he had "minimal contact with peers and supervisors."  AR at 328-29.  When the ALJ asked if Plaintiff would be able to *sustain* work, Dr. Bolter responded, "I'm not really sure.  I think it's a lot of − there would be difficulties if people 'cross him', but again, if he's in a proper environment that's not going to happen very often.  It's hard to compare with the jobs he's had."  AR at 329.

In reference to Dr. Mills' assessment, Dr. Bolter commented that while there were "no notes that you can read," Dr. Mills' notes on April 21, 2005, and May 19, 2005, seem to indicate that Plaintiff was "okay" and "[didn't] have any particular problems there."  AR at 329-30.  He disagreed with Dr. Mills that Plaintiff had a GAF score

1   of 35, noting that while he did not examine Plaintiff, all of the

2   other assessments placed Plaintiff at least a 55.  AR at 329-30.

3        Finally, the ALJ called a VE to testify as to Plaintiff's work

4   limitations.   In his first three hypotheticals to the VE, the ALJ

5   adopted Dr. Hurwitz's assessment (exhibit 5f in the record before

6   the ALJ), Dr. Hicks' assessment (exhibit 4f), and Dr. Soliman's

7   assessment (exhibit 2f), respectively.  AR at 331.  The VE testified

8   that, given each of those sets of limitations, Plaintiff could

9   perform his prior work as a warehouseman or custodian.  AR at 332.

10  For the fourth hypothetical, the ALJ used Dr. Mills' assessment

11  (exhibit 10f).   AR at 332.   Under those limitations, the VE

12  testified that Plaintiff would be unable to work.  AR at 332.  Next,

13  the ALJ said his fifth hypothetical matched the assessment of Dr.

14  Bolter, which he defined as "non-public, minimal contact with peers

15  and supervisors, no cognitive restrictions, can sustain work."  AR

16  at 332.   The VE responded that under those limitations, the

17  custodial job would be appropriate, but not the warehouseman because

18  "the co-worker interaction could be problematic."  AR at 332-33.

19  Lastly, the VE concluded that Plaintiff could not work under

20  Plaintiff's own professed limitations since he testified that he

21  could not sustain full-time work.  AR at 333.

22       **E.   The ALJ's Decision**

23       On August 6, 2005, the ALJ issued a written decision in which

24  he determined that Plaintiff was not disabled because he could

25  perform his past relevant work as a custodian.  AR at 18-19.  The

26  ALJ summarized the various medical opinions submitted and then noted

27  that he had called upon a medical expert witness (Dr. Bolter) to

28  "resolve the discrepancies in the medical opinion."  AR at 16.  He

1   summarized Dr. Bolter's conclusions as follows:

> Dr. Bolter was of the opinion that diagnoses of post traumatic stress disorder, dysthymia, adjustment disorder, and mixed personality disorder were appropriate.  He also noted that the claimant had a history of alcohol addiction disorder and borderline personality disorder, which were no longer present.  He stated that Dr. Mills' reported global assessment of functioning of 35 was simply unsupported by ongoing progress records or other examinations, noting that a patient with such impaired functioning would be expected to be hospitalized.  Based on the clinical record, he estimated that a global assessment of functioning of 55 or 60 would be a more accurate reflection of the clinical findings in the record.  He stated that there was no evidence of cognitive deficit.  However, he stated that the claimant's psychiatric pathology had resulted in moderate restriction of activities of daily living, and marked difficulties maintaining social functioning.  Dr. Bolter also stated that one to two episodes of decompensation in a work-like setting were documented.  He was of the opinion that the claimant remained able to maintain attention and concentration for extended periods, but would be precluded from jobs requiring public contact, or more than minimal interaction with coworkers and supervisors.

AR at 16.   Based upon this assessment, which the ALJ found persuasive, the ALJ found that Plaintiff retained "the residual functional capacity to perform simple or complex tasks in a non-public setting with minimal peer and supervisory contact."  AR at 17.

The ALJ then considered the VE's testimony.  He specifically noted that:

> Based upon a residual function capacity as described above, the vocational expert stated that the claimant would be unable to work as a warehouseman because of the requirement of minimal peer interaction.  However, he would be able to perform duties required by his past work as a custodian.

AR at 17.  Because the ALJ found the VE's testimony persuasive, he adopted it and concluded that Plaintiff was not disabled because he could return to his past relevant work as a custodian.  <u>Id.</u>

Lastly, the ALJ provided the following "clear and convincing reasons" for rejecting Plaintiff's subjective allegations of limitation:

> First, the evidence fails to establish the presence of a mental impairment which may result in limitation to a degree which would preclude sustained, entry level work, at any exertional level. While the claimant has complained of nightmares, flashbacks, sadness, decreased energy, and hypervigilence, repeated examinations have revealed intermittent complaints, with reported relief with medication. His primary problem has been difficulty interacting with other people. There is no objective evidence to establish that the claimant's alleged impairments would result in significant non-exertional limitations that would preclude work with minimal inter-personal interaction. Second, the claimant's allegations of significant limitations are not borne out in the evidence. The claimant is able to use public transportation, attend daily NA/AA meetings, and has passed tests of high intellect for MENSA. Third, the claimant's medications have not imposed disabling side effects. Fourth, the claimant has complained of a "food addiction." However, he has not reported an eating disorder to examining psychiatrists, and there is no clinical evidence of any eating disorder or of significant weight gain. In fact, one consulting psychiatrist has described him as "reasonably well-built" and "in good condition" (Exhibit 4F). Fifth, the claimant's activities of daily living, which include attending school, shopping, and using public transportation, are inconsistent with the presence of significant subjective limitations. The claimant advised Dr. Solimon in March 2003, that he is able to cook, shop, do cleaning, and do errands (Exhibit 2F). Sixth, there is no statement by a physician there is no statement by a physician (sic) with respect to significant subjective limitations. Consequently, the claimant's allegations of disabling subjective limitations are not credible to the extent alleged.

AR at 17-18.

## LEGAL STANDARD

To qualify for disability benefits under the Social Security Act, an applicant must show that: (1) he suffers from a medically determinable impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of twelve months or more; and (2) the impairment renders the

16

applicant incapable of performing the work that he previously performed or any other substantially gainful employment that exists in the national economy.  42 U.S.C. § 423(d)(1)(A), (2)(A).  An applicant must meet both requirements to be considered "disabled."  Id.

The Secretary of the Social Security Administration has established a five-step sequential evaluation process for determining whether a person is disabled.  20 C.F.R. §§ 404.1520, 416.920.  Step one determines whether the claimant is engaged in "substantial gainful activity."  If he is, disability benefits are denied.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If he is not, the decision maker proceeds to step two, which determines whether the claimant has a medically severe impairment or combination of impairments.  20 C.F.R. §§ 404.1520(c)), 416.920(c)).

Where the claimant does not have a severe impairment or combination of impairments, the disability claim is denied.  Where the impairment is severe, the evaluation proceeds to the third step, which determines whether the impairment is equivalent to one of a number of listed impairments that the Secretary acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(d), 416.920(d); 20 C.F.R. § 404, Subpart P, Appendix 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled.  If the impairment is not one that is conclusively presumed to be disabling, the evaluation proceeds to the fourth step, which determines whether the impairment prevents the claimant from performing work he has performed in the past.  A claimant who is able to perform his previous work is not disabled.  20 C.F.R. §§ 404.1520(e),

17

416.920(e).  If the claimant cannot perform his previous work, the fifth and final step of the process determines whether he is able to perform other work in the national economy in view of his age, education, and work experience.  The claimant is entitled to disability benefits only if he is not able to perform other work. 20 C.F.R. §§ 404.1520(f), 416.920(f).

Section 405(g) of the Act allows unsuccessful applicants to seek judicial review of the Social Security Commissioner's final decision.  42 U.S.C. § 405(g).  The scope of judicial review is limited.  The Commissioner's denial of benefits will not be disturbed if it is supported by substantial evidence and contains no legal error.  Batson v. Comm'r Soc. Sec. Admin., 359 F.3d 1190, 1193 (9th Cir. 2004).

Substantial evidence means "more than a mere scintilla but may be less than a preponderance." Lewis v. Apfel, 236 F.3d 503, 509 (9th Cir. 2001) (citation omitted).  It is "relevant evidence that, considering the entire record, a reasonable person might accept as adequate to support a conclusion." Id. (citation omitted); see also Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2003) (finding substantial evidence in the record despite ALJ's failure to discuss every piece of evidence).  Where the evidence can reasonably be construed to support more than one rational interpretation, the court must uphold the ALJ's decision.  Batson, 359 F.3d at 1193.  This includes deferring to the ALJ's credibility determinations and resolutions of evidentiary conflicts.  See Lewis, 236 F.3d at 509.

Even if the reviewing court finds that substantial evidence supports the ALJ's conclusions, the court must set aside the

18

06cv0216-J (BLM)

1  decision if the ALJ failed to apply the proper legal standards in
2  weighing the evidence and reaching his or her decision.  See Batson,
3  359 F.3d at 1193.   Section 405(g) permits a court to enter a
4  judgment affirming, modifying, or reversing the Commissioner's
5  decision.  42 U.S.C. § 405(g).  The reviewing court may also remand
6  the matter to the Social Security Administration for further
7  proceedings.  Id.

8                          **DISCUSSION**

9       Plaintiff contends that he has been disabled from approximately
10 November 26, 2002 to the present and, as a result, is entitled to
11 receive disability benefits and supplemental social security income.
12 Specifically, Plaintiff argues that the ALJ erroneously denied his
13 claim for such benefits by failing to (1) rate the limitations on
14 Plaintiff's mental function within each of the required four
15 categories, (2) specifically evaluate in his written decision the
16 credibility of a lay witness's evaluation of Plaintiff, and (3)
17 provide clear and convincing or specific and legitimate reasons for
18 rejecting the assessment rendered by Plaintiff's treating physician,
19 Dr. Mills.  Pl.'s Mem. at 9-11, 14-20.  Additionally, Plaintiff
20 contends that Defendant violated Plaintiff's due process rights and
21 the Social Security Administration's own regulations when ALJ
22 Carletti signed the decision "for" ALJ Steinman.  Id. at 11-14.
23 For these reasons, Plaintiff asserts that the ALJ committed legal
24 error and that his opinion was not supported by substantial
25 evidence.  Plaintiff asks this Court to reverse the ALJ's decision
26 and immediately award Plaintiff disability benefits.  Alternatively,
27 Plaintiff requests that the Court remand the case for a new hearing.
28 ///

Defendant counters that the ALJ's decision was based upon substantial evidence and free from error.  First, Defendant asserts that the ALJ did properly rate the degree of Plaintiff's mental functional limitations by virtue of having incorporated the medical expert's assessment into his decision (the medical expert's assessment having been based, in part, upon his review of the entire record, which included the Psychiatric Review Technique Form completed by Dr. Hurwitz).  Def.'s Opp'n at 5-6.  Second, Defendant argues that the ALJ was not required to discuss the credibility of the lay witness's testimony because it was not "significant probative evidence" and, regardless, it fundamentally duplicated Plaintiff's testimony, which the ALJ properly discredited.  Id. at 6-7.  Third, because the ALJ adopted Dr. Bolter's opinion, which contradicted Dr. Mills' assessment on several points, Defendant contends that the ALJ properly rejected Dr. Mills' medical opinion. Id. at 7-8.  Finally, Defendant asserts that Plaintiff was not denied due process when ALJ Carletti signed the decision "for" ALJ Steinman.  Id. at 6.  In conclusion, Defendant maintains that the ALJ properly evaluated the medical evidence and testimony presented and issued a decision denying Plaintiff's claim for disability benefits that was supported by substantial evidence and free from reversible legal error.

In his opposition to Defendant's cross-motion for summary judgment, Plaintiff objects to Defendant's contention that the ALJ complied with the regulations by incorporating Dr. Bolter's findings and the psychiatric review form completed by Dr. Hurwitz into his decision.  Pl.'s Opp'n at 1-3.  Likewise, Plaintiff argues that Mr. Nichols' (lay witness) testimony was "significant probative

evidence" because it corroborated and substantiated Plaintiff's testimony and was consistent with Dr. Mills' assessment of Plaintiff's inability to work. Id. at 4. As to Dr. Mills' opinion, the degree of reasoning necessary to reject a treating physician's opinion depends upon whether or not the opinion was contradicted by other medical evidence in the record. See id. at 6. Plaintiff contends that the ALJ failed to provide sufficient reasons for rejecting Dr. Mills' assessment under either possible standard. Id. Plaintiff then reiterates his argument that his due process rights were violated. Id. at 5-6. Finally, to the extent Defendant asserts that the ALJ properly relied on Dr. Bolter's testimony, Plaintiff argues that the ALJ failed to develop the record in order to clarify some ambiguity in Dr. Bolter's testimony. Id. at 9-10.

**A.   The ALJ Failed to Provide Clear and Convincing or Specific and Legitimate Reasons for Rejecting the Treating Physician's Opinion and Erred in Relying Solely on the Medical Expert's Testimony**

Plaintiff claims that the ALJ improperly rejected Plaintiff's treating physician's opinion. Pl.'s Mem. at 4. The rationale for affording greater weight to treating physicians is set forth in Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996):

> Because treating physicians are employed to cure and thus have a great opportunity to know and observe the patient as an individual, their opinions are given greater weight than the opinions of other physicians. Therefore, an ALJ may not reject treating physicians' opinions unless he "makes findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." In addition, if the treating physicians' opinions are uncontroverted, those reasons must be clear and convincing.

Smolen, 80 F.3d at 1285 (internal citations omitted). Where a conflict in medical opinions exists, the contrary opinion of another

medical expert (even a non-examining one) may constitute substantial evidence if it is consistent with other independent record evidence. Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001).  Further, a treating physician's conclusory or unsupported medical findings need not be automatically accepted as true in the face of contradictory clinical opinions.  Id.

In this case, the ALJ not only failed to provide reasons for rejecting Dr. Mills' assessment, he did not directly respond to Dr. Mills' assessment at all.  Instead, he almost entirely subrogated his role in evaluating the credibility of the medical testimony to the medical expert.  In his report, the ALJ summarized the medical evidence and Dr. Bolter's testimony[6] and then laid out the entirety of his findings on the medical evidence:

> The undersigned is persuaded by the testimony of the medical expert witness.  Considering the degree of limitation of mental function as stated by Dr. Bolter, the undersigned finds that the claimant's psychiatric pathology has resulted in mild to moderate limitations of work-related mental functioning, which restrict him to non-public work activity, with minimal peer and supervisory interaction.  Frequent oral communication is precluded.  There are no exertional limitations.  Accordingly, the undersigned finds the claimant retains the residual functional capacity to perform simple or complex tasks in a non-public setting with minimal peer and supervisory contact.

AR at 17.  Nowhere in this brief analysis does it explain his reasons for crediting or discrediting the testimony of any of the other physicians whose reports were included in the record.  Most notably absent is any direct consideration of the evaluation provided by Plaintiff's treating physician, Dr. Mills, in which she offered her opinions that Plaintiff's symptoms "restrict [his] ability to perform, obtain, and maintain employment" and that

---

[6]   The accuracy of this summary will be addressed below.

Plaintiff would "have difficulty working at a regular job on a sustained basis."  AR at 296.

In rejecting a treating physician's opinion, the ALJ must first explain whether the opinion is controverted.  This determines which standard ("clear and convincing" or "specific and legitimate") the ALJ must meet in explaining his reasons for rejecting the treating physician's opinion.  See Smolen, 80 F.3d at 1285.  Here, the ALJ did not expressly state in his decision whether or not Dr. Mills' opinion was controverted by other substantial evidence in the record.

Whether or not Dr. Mills' opinion was, in fact, controverted, the ALJ did not provide any reasons for discrediting it.  As previously stated, an ALJ must provide specific and legitimate reasons, based on substantial evidence in the record, for discrediting a treating physician's opinion where that opinion contradicts other record evidence.  Id.  Where the opinion is uncontradicted, the ALJ must provide clear and convincing reasons for rejecting the treating physician's opinion.  Id.  Even if the treating physician's opinion is "conclusory and brief and unsupported by clinical findings," the ALJ must provide sufficient reasons for rejecting the opinion.  See Tonapetyan, 242 F.3d at 1149.  Here, the ALJ did not provide any reasons for rejecting Dr. Mills' extensive opinion, which was supported by her notes in the medical records and buttressed by other evidence.

To the extent Defendant argues that the ALJ implicitly rejected Dr. Mills' assessment by virtue of his reliance on Dr. Bolter's opinion, this argument lacks merit.  Dr. Bolter never listed the grounds on which his opinion contradicted Dr. Mills' or the reasons

23

06cv0216-J (BLM)

he felt that Dr. Mills' testimony lacked credibility.[7]  Because these are the types of findings the ALJ is required to make in rejecting a treating physician's opinion (see Smolen, 80 F.3d at 1285), Dr. Bolter's opinion does not adequately stand in the place of the ALJ's required findings.  Moreover, fundamental to Defendant's argument that the ALJ properly relied upon the opinion of Dr. Bolter over that of Plaintiff's treating physician (Def.'s Opp'n at 7-8) is the assumption that the ALJ may call upon a medical advisor to stand in the ALJ's shoes - i.e. evaluate the medical evidence and credit or discredit certain physicians.  This is not the case.  Evaluating the medical evidence and making a decision as to the credibility of the examining and non-examining physicians is not the medical expert's proper role.  "Medical advisors are, by definition, non-examining physicians.  Their function is 'to explain complex medical problems in terms understandable to lay examiners.'  Their function is not to offer opinions as to whether claimants, whom the medical advisors have never examined, are capable of working."  Kubitschek, Carolyn. Social Security Disability Law and Procedure in Federal Court, §§ 2:25-2:26 (Thompson/West 2006).  In discussing the appropriateness of using medical advisors during disability claim hearings, the

---

[7]    The only reference to Dr. Mills in the ALJ's recitation of Dr. Bolter's testimony is the portion of the decision that reads "[h]e [Dr. Bolter] stated that Dr. Mills' reported global assessment of functioning of 35 was simply unsupported by ongoing progress records or other examinations, noting that a patient with such impaired functioning would be expected to be hospitalized."  AR at 16.  Even then, while Dr. Bolter did disagree with the GAF score assessed by Dr. Mills (AR at 330), it was the ALJ, not Dr. Bolter, who opined that an individual with a GAF of 35 would need to be hospitalized.  See AR at 330.  The ALJ also did not reference Dr. Bolter's next statement on the record, which was that he could not really read Dr. Mills' notes.  See AR at 330.

Supreme Court has explained that:

> The trial examiner is a layman; the medical adviser is a board-certified specialist. He is used primarily in complex cases for explanation of medical problems in terms understandable to the layman-examiner. He is a neutral adviser.

Richardson v. Perales, 402 U.S. 389, 408 (1971).  While a non-treating medical advisor's opinion may serve as substantial evidence if it is supported by other evidence in the record, "[w]hen a nontreating physician's opinion contradicts that of the treating physician-but is not based on independent clinical findings, or rests on clinical findings also considered by the treating physician-the opinion of the treating physician may be rejected only if the ALJ gives 'specific, legitimate reasons for doing so that are based on substantial evidence in the record.'"  Morgan v. Comm'r Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999) (citing Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) and Magallanes v. Bowen, 881 F.2d 747, 751, 755 (9th Cir. 1989)).  Thus, Dr. Bolter's opinion should have been accorded no more weight that those of other non-examining, consultative physicians and Dr. Bolter's review of the medical evidence did not excuse the ALJ from his duty to set forth reasons for rejecting Dr. Mills' opinion.  See Lester v. Chater, 81 F.3d 821, 833 (9th Cir. 1995) (holding that a "nonexamining medical advisor's testimony does not by itself constitute substantial evidence that warrants a rejection of either the treating doctor's or the examining psychologist's opinion").

Dr. Bolter's testimony also did not contradict Dr. Mills' assessment that Plaintiff would have difficulty "sustaining" employment.  See Pl.'s Mem. at 17.  When the ALJ asked Dr. Bolter whether Plaintiff would be able to sustain work, Dr. Bolter

responded "*I'm not really sure*.  I think it's a lot of - - there would be difficulties if people 'cross him', but again, if he's in the proper environment that's not going to happen very often.  It's hard to compare with the jobs he's had."  (emphasis added) AR at 329.   This equivocal response hardly stands out as a stark contradiction to Dr. Mills' opinion and it does not provide a clear and convincing reason for rejecting it.[8]

---

[8]    Additionally, given both Dr. Mills and Dr. Bolter's statements about Plaintiff's ability to sustain employment, the ALJ should have analyzed whether Plaintiff would be able to sustain work long enough for it to constitute "substantial gainful employment" under the regulations.  In reviewing this issue in a case involving very similar facts, the Ninth Circuit held:

> We are persuaded by the reasoning of our sister circuits that substantial gainful activity means more than merely the ability to find a job and physically perform it; it also requires the ability to hold the job for a significant period of time. It requires no leap to conclude that two months is not a significant period. Indeed, the SSA considers jobs that end within three months because of the claimant's impairments to be "unsuccessful work attempts," and does not consider such short-term jobs as evidence of an ability to engage in substantial gainful activity. SSR 84-25; *see also Andler v. Chater*, 100 F.3d 1389, 1392 (8th Cir. 1996) ("The 'unsuccessful work attempt' concept was designed as an equitable means of disregarding relatively brief work attempts that do not demonstrate sustained substantial gainful employment."). If a job of less than three months does not constitute substantial gainful activity when considering the claimant's past work history, the same holds true with regard to prospective employment.

Gatliff v. Comm'r Soc. Sec. Admin., 172 F.3d 690, 694 (9th Cir. 1999).  While neither party specifically addressed this issue, the record in this case reflects that Plaintiff has held at least thirteen jobs over the last ten years. AR at 95, 111, 143.  Plaintiff reports having been fired from many of them.  Because the ALJ, Dr. Mills, Dr. Hicks, and Dr. Bolter generally acknowledge that Plaintiff's mental illness manifests in Plaintiff being unable to interact well with supervisors (AR at 17, 192, 296-97, 328-29), it is undisputed that Plaintiff's mental limitations interfere with his work.  On remand, should the ALJ determine at step four or five of the social security administration's sequential analysis (after having properly considered the treating physician's and lay witness's opinions) that Plaintiff is able to work, the ALJ also must consider whether Plaintiff can *sustain* "substantial gainful employment." See Gatliff, 172 F.3d at 694.

1    In sum, the ALJ erred by relying solely on the medical expert's

2    opinion, by not specifically addressing the treating physician's

3    opinions, by not giving the treating physician's opinions the

4    deferential weight to which they are entitled, and by not providing

5    sufficient reasons for rejecting the treating physician's opinions.

6    See Smolen, 80 F.3d at 1285.  Absent a showing that these failures

7    constituted harmless error, the Court must remand for further review

8    or an award of benefits.   Here, the ALJ denied Plaintiff's

9    disability claim so this Court finds that the error was not

10   harmless.  See Widmark v. Barnhart, 454 F.3d 1063, 1069 n.4 (9th

11   Cir. 2006) (ALJ's improper rejection of treating physician's opinion

12   not harmless error where error led to an adverse disability

13   finding).  Moreover, because the ALJ failed to provide reasons for

14   discrediting Dr. Mills' opinions, this Court has no basis to

15   evaluate his reasoning.  Accordingly, this Court recommends that the

16   case be remanded.

17   **B.    The ALJ Failed to Discuss Competent Lay Witness Testimony**

18       Plaintiff argues that the ALJ also erred by not considering the

19   testimony of Plaintiff's friend, James Nichols, in his decision.

20   Pl's Mem. at 14-5.  Defendant disagrees.

21       "In determining whether a claimant is disabled, an ALJ must

22   consider lay witness testimony concerning a claimant's ability to

23   work."  Stout v. Comm'r Soc. Sec. Admin., 454 F.3d 1050, 1053 (9th

24   Cir. 2006)[9] (citing Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir.

25       [9]    Plaintiff lodged the Ninth Circuit's recent decision in Stout v.

26   Comm'r Soc. Sec. Admin., 454 F.3d 1050 (9th Cir. 2006) with this Court after the

27   parties had already completed briefing on their cross-motions for summary
     judgment.   While the Stout case was decided after the Social Security

28   Administration and ALJ's decisions in this case, it does not establish new law on

27

1993); 20 C.F.R. §§ 404.1513(d)(4) & (e), 416.913(d)(4) & (e)).  The
rationale for this is that "lay testimony as to a claimant's
symptoms or how an impairment affects ability to work *is* competent
evidence ... and therefore *cannot* be disregarded without comment."
Nquyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) (citations
omitted).   Consequently, "[i]f the ALJ wishes to discount the
testimony of lay witnesses, he must give reasons that are germane to
each witness."   Dodrill*, 12 F.3d at 919; see also Robbins v. Soc.
Sec. Admin., __ F.3d __, 2006 WL 3041106 at *4 (9th Cir. 2006) ("the
ALJ is required to account for all lay witness testimony in the
discussion of his or her findings")[10].

The Social Security Administration ("SSA") appears to encourage
lay testimony because it publishes an extensive questionnaire
entitled "Function Report Adult - Third Party" (form SSA-2280-BK).
In this case, Mr. Nichols filled out this exact form and in the
form, which was included in the record before the ALJ, Mr. Nichols
provided numerous narrative answers, described his personal
observations about Plaintiff's symptoms, and stated how he believed
Plaintiff's impairments impact his ability to work.  AR at 121-29.

As Plaintiff points out, Mr. Nichols' statements specifically
address one of the primary limitations at issue in assessing
Plaintiff's ability to sustain employment - Plaintiff's ability to

the issue of an ALJ's duty to consider competent lay witness testimony.  To the
contrary, Stout confirms case law in effect well before Plaintiff sought
disability benefits.  Accordingly, this Court cites to the Stout case as a well-
reasoned opinion that compiles applicable governing law on this issue.

    [10]    As with the Stout case discussed at footnote 10, Robbins v. Social
Security Administration was decided after Plaintiff initiated this action, but
confirms precedent regarding the ALJ's duty to consider lay witness testimony.

work with other people.  <u>See</u> Pl.'s Mem. at 14.  Section C of the Function Report asks the third-party to "[c]ircle any of the following items the disabled person's illness, injuries, or conditions affect."  AR at 126.  Mr. Nichols circled "completing tasks," "concentration," "following instructions," and "getting along with others."  <u>Id.</u>  As a follow up question, the Function Report asks "[p]lease explain how his/her illness, injuries or conditions affect each of the items you circled."  <u>Id.</u>  In response, Mr. Nichols wrote:

> (1) Following instructions - takes them as a personal threat - will do something different (2) Completing tasks - become (sic) easily distracted & forgets about what he was doing (3) Concentration - has a short attention span - usually has his own ideas about things [4] Getting along [] with others - is easily hurt by others - feels that other people have wronged him - don't care or have deceived him - has trouble listening to other people's point of view - thinks everyone else is crazy but himself.

<u>Id.</u> at 126, 128.  To the question "[h]as he/she ever been fired or laid off from a job because of problems getting along with other people," Mr. Nichols replied "yes" and wrote "[h]e told me about various jobs he had & it usually evolves (sic) around him telling them how the job should be done."  AR at 127.  In response to the next question, "[h]ow well does the disabled person handle stress," Mr. Nichols wrote "[t]his is one of his biggest problems - if he feels any type of pressure - he becomes fearful - disorientated (sic) - trouble taking care of himself - unreasonable ideas & demands on others - to the point of not making sense."  AR at 127.  These statements are highly relevant to Plaintiff's ability to work with others within the confines of a work environment.  Regardless of whether he decided to credit or discredit Mr. Nichols', the ALJ ///

1  was required to address Mr. Nichols' opinions.[11]  See Lewis, 236 F.3d

2  at 511 ("Lay testimony as to a claimant's symptoms is competent

3  evidence that an ALJ must take into account, unless he or she

4  expressly determines to disregard such testimony and gives reasons

5  germane to each witness for doing so").  The ALJ erred by failing to

6  do so.  See Nguyen, 100 F.3d at 1467.

7      Defendant's assertion that it was unnecessary to address Mr.

8  Nichols' statements because they were duplicative of Plaintiff's

9  testimony is incorrect.  The fact that Mr. Nichols' statements are

10  consistent with Plaintiff's testimony serves only to further

11  corroborate Plaintiff's disability claims.  See Robbins, __ F.3d __,

12  2006 WL 3041106 at *4 (holding that ALJ erred by not considering

13  testimony of claimant's son, which, if credited, added "substantial

14  weight" to testimony of claimant, his wife, and his daughter).  In

15  fact, Social Security Ruling ("SSR") 96-7p specifically acknowledges

16  that "[o]ne strong indication of the credibility of an individual's

17  statements is their consistency, both internally and with other

18  information in the case record."  SSR 96-7p (July 7, 1996).  "The

19  adjudicator *must* consider such factors as ... reports and

20

21      [11]      To the extent that Defendant contends that Vincent v. Heckler, 739

22  F.2d 1393, 1395 (9th Cir. 1984) eliminates the need to consider lay testimony, she
   is mistaken.  Defendant cites to Vincent for the proposition that an ALJ does not

23  err by discounting "lay witness testimony that conflicted with the available
   medical evidence."  Def.'s Opp'n at 6.  However, as explained in Nguyen, the lay

24  witnesses in Vincent were making medical *diagnoses*, which "are beyond the

25  competence of lay witnesses and therefore do not constitute competent evidence."

26  Nguyen, 100 F.3d at 1467 (citing 20 CFR § 404.1513(a)).  On the other hand, lay

27  witnesses can testify about their observations and knowledge of a claimant's
   symptoms and how the claimant's impairments affect his or her ability to work.

28  Id.  This latter information is just the type of assessment Mr. Nichols provided.

observations by other persons concerning the individual's daily activities, behavior, and efforts to work." (emphasis added) SSR 96-7p (July 7, 1996). As such, the overlap between Mr. Nichols' statements and Plaintiff's testimony provided more, not less, of a need for the ALJ to expressly explain his basis for apparently discrediting Mr. Nichols.

Furthermore, while Defendant sets forth several reasons why the ALJ could have discredited Mr. Nichols' opinions, none of these reasons were set forth in the ALJ's decision. To the contrary, the ALJ's decision failed to even mention Mr. Nichols. This Court "cannot affirm the decision of an agency on a ground that the agency did not invoke in making its decision." Pinto v. Massanari, 249 F.3d 840, 847 (9th Cir. 2001) (citing SEC v. Chenery Corp., 332 U.S. 194, 196 (1947)). Defendant argues that Mr. Nichols' opinion is not particularly valuable, since Mr. Nichols only sees Plaintiff six to eight hours per week, not on a daily basis. Def.'s Opp'n at 6. Further, Defendant suggests that, because Mr. Nichols' statements were essentially cumulative of Plaintiff's testimony, which the ALJ considered, the ALJ need not have separately considered Mr. Nichols' opinion. Def.'s Opp'n at 7. However, if Defendant asks this Court to discredit Mr. Nichols' by proxy, and "invites this Court to affirm the denial of benefits on a ground not invoked by the Commissioner in denying the benefits originally, then we must decline."[12]  See Stout, 454 F.3d at 1054 (quoting Pinto, 249 F.3d at

---

[12]  Though Defendant did not expressly argue that the ALJ's failure to even discuss Mr. Nichols' opinion was harmless error, the Court notes that application of this standard would not alter this Court's recommendation. As noted in Stout and reconfirmed in Robbins, the Ninth Circuit "ha[s] never found harmless an 'ALJ's silent disregard of lay testimony about how an impairment

847–48).

In sum, this Court finds that the ALJ's silent disregard for Mr. Nichols' statements constituted legal error.  See Stout, 454 F.3d at 1056 (concluding that ALJ's silent disregard for lay testimony was legal error because it left appellate court "with nothing to review to determine whether the error materially impacted the ALJ's ultimate decision").

**C.   The ALJ Did Not Properly Rate the Degree of Plaintiff's Mental Function Limitations**

Plaintiff argues that the ALJ failed to make specific findings as to his degree of functional limitations, as required by Social Security regulations.  Pl.'s Mem. at 9-11.  Specifically, the ALJ must rate the degree of functional limitation in the areas of (a)daily activities, (b) social functioning, and (c) concentration, persistence or pace as being either none, mild, moderate, marked, or extreme, as well as report the number of episodes of decompensation (choosing one of the following options: one, one or two, three, or four or more).  Pl.'s Mem. at 10; 20 C.F.R. § 404.1520a.  While the regulations originally required the ALJ to provide these ratings on

---

limits a claimant's ability to work.'"  Robbins, __ F.3d __, 2006 WL 3041106 at *4 (quoting Stout, 454 F.3d at 1055-56).  "[W]here the ALJ's error lies in a failure to properly discuss competent lay testimony favorable to the claimant, a reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination."  Stout, 454 F.3d at 1056.  That is not the case here where, if fully credited, Mr. Nichols' statements support Dr. Mills' assessment and other evidence in the record showing that Plaintiff's mental impairments result in an inability to work with other people and to sustain employment.  A reasonable ALJ could find that this precludes Plaintiff from working, particularly if the ALJ considered that the regulations require the ability to sustain employment.

a Psychiatric Review Technique Form ("PRTF") and append the form to his or her decision (20 C.F.R. § 404.1520a (2000)), the ALJ may now incorporate the ratings into the text of the decision (20 C.F.R. § 404.1520a (2006)).   Plaintiff contends that the ALJ's failure to rate his functional limitations is reversible error under <u>Gutierrez v. Apfel</u>, 199 F.3d 1048, 1051 (9th Cir. 2000).   Pl.'s Mem. at 10-11.

Defendant counters that a PRTF was completed and that the medical expert, whose assessment the ALJ incorporated into his decision, reviewed this form.   Def.'s Opp'n at 5-6.   This position is problematic for two reasons.   First, the PRTF to which Defendant refers was completed by Dr. Hurwitz on November 17, 2003 - nearly two years prior to the hearing before the ALJ.   AR at 198-211.   In <u>Gutierrez</u>, the court specifically found that PRTFs completed by someone other than the ALJ more than one year before the hearing did not cure the ALJ's violation.   <u>Gutierrez</u>, 199 F.3d at 1051.   Second, while the ALJ does attribute ratings pertaining to these four criteria to Dr. Bolter, not all of these statements or ratings are actually present in Dr. Bolter's testimony.   As such, the ALJ's findings do not include the required "significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s)."   20 C.F.R. § 404.1520a(e)(2). Accordingly, this Court agrees with Plaintiff that <u>Gutierrez</u> requires that the case be remanded.   <u>Gutierrez</u>, 199 F.3d at 1051.

**D.   <u>Proceedings on Remand</u>**

In light of this Court's recommendation that this case be remanded, the Court must consider whether an immediate award of benefits is appropriate or whether outstanding issues remain that

1   must be resolved on remand.  Generally when a court reverses an

2   administrative determination, it should be remanded to the agency

3   for additional investigation or explanation.  Benecke v. Barnhart,

4   379 F.3d 587, 595 (9th Cir. 2004) (quoting INS v. Ventura, 537 U.S.

5   12, 16 (2002)); Connett v. Barnhart, 340 U.S. 871, 876 (9th Cir.

6   2003).  However, before making this determination, the court should

7   consider the totality of the record:

> Remand for further administrative proceedings is
> appropriate if enhancement of the record would be useful.
> Conversely, where the record has been developed fully and
> further administrative proceedings would serve no purpose,
> the district court should remand for an immediate award of
> benefits.  More specifically, the district court should
> credit evidence that was rejected during the
> administrative process and remand for an immediate award
> of benefits if (1) the ALJ has failed to provide legally
> sufficient reasons for rejecting such evidence, (2) there
> are no outstanding issues that must be resolved before a
> determination of disability can be made, and (3) it is
> clear from the record that the ALJ would be required to
> find the claimant disabled were such evidence credited.

16  Benecke, 379 F.3d at 593 (citations omitted).  However, even where

17  the "crediting as true" doctrine is satisfied, the court retains

18  some flexibility in applying it.  Connett, 340 F.3d at 876.

19       Here, the Court finds that it is appropriate to remand the case

20  for further administrative proceedings because the record is not

21  fully developed and there are outstanding credibility determinations

22  that need to be made by the ALJ.  For example, as discussed above,

23  the ALJ failed to address and credit or discredit the opinions of

24  the treating physician and a relevant lay witness.  Both of these

25  individuals were percipient witnesses who provided relevant

26  information relating to the Plaintiff's disability claim.  This

27  Court cannot properly review the denial without the ALJ's statement

28  that those opinions were discredited and the reasons therefore.

1  Moreover, it is not clear from the existing record that even if both
2  opinions were credited as true, the ALJ would be required to find
3  Plaintiff disabled.  Therefore, this Court recommends that the case
4  be remanded for further review.

5  ### CONCLUSION AND RECOMMENDATION

6  In light of the foregoing, this Court finds that the ALJ
7  committed legal error.[13]  See Batson, 359 F.3d at 1193 (holding that
8  the court must set aside the decision if the ALJ failed to apply the
9  proper legal standards in weighing the evidence and reaching his or
10  her decision).

11  Accordingly, this Court **RECOMMENDS** that Defendant's cross-
12  motion for summary judgment [Doc. No. 14] be **DENIED**, Plaintiff's
13  motion for summary judgment [Doc. No. 11] be **GRANTED**, and that the
14  case be **REMANDED** for further proceedings consistent with this order.

15  This Report and Recommendation of the undersigned Magistrate
16  Judge is submitted to the United States District Judge assigned to
17  this case, pursuant to the provision of 28 U.S.C. § 636(b)(1).

18  **IT IS HEREBY ORDERED** that any written objections to this Report
19  must be filed with the Court and served on all parties **no later than**
20  **December 15, 2006**.  The document should be captioned "Objections to
21  Report and Recommendation."

22  ///

23  _____

24  [13]  In regard to Plaintiff's due process argument, because Plaintiff
presents no evidence that ALJ Steinman did not draft the decision signed "for" him
25  by ALJ Carletti, this Court finds insufficient basis for concluding that, by
26  having another ALJ sign "for" him instead of rubber-stamping his name, ALJ
27  Steinman's actions rose to the level of a due process violation.  Furthermore,
because this Court recommends that the case be remanded, the issue of who, in
28  fact, drafted the original decision becomes moot.

1    **IT IS FURTHER ORDERED** that any reply to the objections shall be

2  filed with the Court and served on all parties **no later than January**

3  **12, 2007**.   The parties are advised that failure to file objections

4  within the specified time may waive the right to raise those

5  objections on appeal of the Court's order.   <u>Turner v. Duncan</u>, 158

6  F.3d 449, 455 (9th Cir. 1998).

7

8  DATED:   November 17, 2006

9

10                                   BARBARA L. MAJOR
                                     United States Magistrate Judge

11

12

13  COPY TO:

14  HONORABLE NAPOLEON A. JONES
    UNITED STATES DISTRICT JUDGE

15

16  ALL COUNSEL

17

18

19

20

21

22

23

24

25

26

27

28